United States District Court
Southern District of Texas

**ENTERED**

December 10, 2020

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PRUCO LIFE INSURANCE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION H-17-2795 |
| | § | |
| BLANCA MONICA VILLARREAL, | § | |
| | § | |
| Defendant. | § | |

| | | |
|---|---|---|
| TRANSAMERICA LIFE INSURANCE COMPANY, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION H-17-2796 |
| | § | |
| BLANCA MONICA VILLARREAL, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

This dispute over a life insurance policy has been hard fought. The facts are unusual, the amount of money is large, and discovery had to be conducted in two countries. The result has been frequent discovery battles. The current dispute is the most recent eruption. Attempting to cut through the confusion and noise has proven difficult for the court, particularly given the increasingly vituperative accusations of misconduct both sides have hurled at the other.

In October 2020, this court permitted Transamerica Life Insurance Co. and Pruco Life Insurance Co. to depose Oscar Gonzalez Abraham, Blanca Monica Villarreal's investigator.[1]

---

[1] These two life-insurance cases are proceeding on a coordinated basis. (*See* Case No. 17-2796, Docket Entry No. 9). All citations are to the first case, *Pruco Life Insurance Co. v. Villarreal*, No. 4:17-cv-2795 (S.D. Tex. Sept. 15, 2017), unless otherwise indicated.

(Docket Entry No. 147).  Villarreal hired Abraham to investigate the critical fact in this case—whether the insured, Eduardo Gonzalez Rosendi, is alive in Mexico.  (*Id.*).  While investigating, Abraham discovered Laura Hernandez, who reported seeing Eduardo Gonzalez Rosendi alive in March 2018, over a year after his supposed death in December 2016.  This court held that work-product protection did not prohibit the insurers from asking Abraham in discovery about "the facts he learned from his investigation of [Laura] Hernandez," his "investigation," and "whether he produced his entire investigation file on Hernandez."  (*Id.* at 3).

On October 30, the insurers attempted to depose Abraham, but were met with vigorous objections from Villarreal's counsel, John Black, who claimed that work-product protection prohibited the insurers from asking about anything other than a few questions about Hernandez and about whether Abraham had turned over his entire investigation file.[2]  Black objected to questions about the scope of Abraham's investigation, how Abraham had located Hernandez and the office where she worked, who Abraham told about his encounter and discussion with Hernandez, the scope of his investigation after locating Hernandez, and whether Abraham was threatened after he located Hernandez.  Black also called Abraham a liar when he testified that he spoke to Black over the telephone on May 5, 2018, the day Abraham discovered Hernandez.  Abraham revealed that he had not turned over his full investigation report.  The parties eventually agreed that continuing the deposition would not be productive.  Abraham later produced the remainder of his investigation report to Villarreal, who provided heavily redacted copies to the insurers.

---

[2] Kevin Pipkins also attended the deposition.  Villarreal hired Pipkins as an investigator.  Pipkins then hired Abraham to perform portions of the investigation into whether Eduardo Gonzalez Rosendi passed away or was still alive in Mexico.

The insurers now ask this court to eliminate work-product protection for the entirety of Abraham's investigation. The insurers argue that work-product protection no longer covers Abraham's testimony and investigation files because Villarreal's attorneys, specifically Black, have made misrepresentations to the court. The insurers point out that, after being notified that Abraham discovered Hernandez, Villarreal quickly filed a summary judgment motion, signed by Black, representing that "[t]here is simply no evidence" that Rosendi is alive. (Docket Entry No. 27 at 18). Villarreal strenuously disagrees that the motion contained misrepresentations. Both parties request a court-supervised deposition.

Based on the parties' letter briefs, the record, and the applicable law, the court finds that Villarreal's counsel misrepresented material facts to the court. Work-product protection is no longer justified over the part of Abraham's investigation that occurred on and after the date he was instructed to investigate Avenue Homero 527 in Mexico City, Mexico, or independently decided to take the investigation he already been instructed to conduct to this address.

The insurers may resume their deposition of Abraham and ask about his investigation on or after the date he began investigating Avenue Homero 527. The court also orders Villarreal to produce new copies of Abraham's documents, which are Bates stamped OSCAR GONZALEZ ABRAHAM 000001–000683. Villarreal may retain the redactions on documents relating to events that occurred before Abraham was instructed to investigate Avenue Homero 527, or decided to include it in his ongoing investigation. But Villarreal must produce unredacted copies of documents that relate to events occurring on or after Abraham was instructed or decided to investigate Avenue Homero 527. The court grants both parties' request for court supervision of the deposition, to be scheduled no later than January 31, 2021.

## I.      Legal Standard

 Work-product protection "serves to protect the interests of clients and their attorneys in preventing disclosures about the case by shielding the lawyer's mental processes from his adversary." *In re EEOC*, 207 F. App'x 426, 431 (5th Cir. 2006) (citation omitted).  The protection is not designed "to protect any interest of the attorney . . . but to protect the adversary trial process itself," because "the integrity of our system would suffer if adversaries were entitled to probe each other's thoughts and plans concerning the case."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 864 (D.C. Cir. 1980).  Work-product protection "is not absolute and is subject to several exceptions."  *United States v. Edwards*, 303 F.3d 606, 618 (5th Cir. 2002).  The crime-fraud exception allows a party to discover attorney work product when "communication or work product is intended to further continuing or future criminal or fraudulent activity."  *Id.* (quoting *In re Grand Jury Subpoena*, 220 F.3d 406, 410 (5th Cir. 2000) (quotation marks omitted)).  The party seeking discovery of otherwise protected evidence "has the burden of establishing a prima facie case that [work-product protection] was intended to further criminal or fraudulent activity."  *In re Grand Jury Subpoena*, 220 F.3d at 410.

## II.     Analysis

 Courts have consistently held that an attorney's misconduct may "overcome attorney work-product protection."  *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1337 (11th Cir. 2018); *see also United States v. Christensen*, 828 F.3d 763, 805 (9th Cir. 2015) ("[C]onduct by an attorney that is merely unethical, as opposed to illegal, may be enough to vitiate the work product doctrine."); *In re Impounded Case (Law Firm)*, 879 F.2d 1211, 1213–14 (3d Cir. 1989) (allowing crime-fraud exception to overcome work-product protection due to "possible criminal activity of [a] law firm"); *Moody v. IRS*, 654 F.2d 795, 799–801 (D.C. Cir. 1981) ("[I]n some

4

circumstances, a lawyer's unprofessional behavior may vitiate the work product privilege."); *In re Doe*, 662 F.2d 1073, 1079 (4th Cir. 1981) (the crime-fraud exception allowed disclosure of work product when the lawyer, not client, was alleged to have engaged in the fraud).

The case law is unclear as to whether attorney misconduct is a distinct exception to work-product protection or a subspecies of the crime-fraud exception. *See* 24 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 5501 (1st ed. 2020) ("Care should be taken to distinguish requiring disclosure pursuant to the crime-fraud exception from requiring disclosure as a sanction for attorney misconduct. Indeed, a Court may even be confused between the two."). Some courts have seemingly applied a distinct attorney-misconduct exception. *See Moody*, 654 F.2d at 800 ("We agree that, at least in some circumstances, a lawyer's unprofessional behavior may vitiate the work product privilege."). Others have held that fraud on the court is sufficient to satisfy the crime-fraud exception. *See Drummond Co.*, 885 F.3d at 1338 ("[A]n attorney may not exploit work product protection when she engages in . . . a fraud upon the court even if her client is innocent.").

Whether attorney misconduct is a distinct exception or an example of the crime-fraud exception, courts follow the same logic. Because work-product protection is designed to promote justice and discourage "unfairness and sharp practices," *Hickman v. Taylor*, 329 U.S. 495, 511–512 (1947), courts hold that it would be "'perverse . . . to allow a lawyer to claim an evidentiary privilege to prevent disclosure of work product generated by [unethical conduct]' when this is the type of conduct that the work-product doctrine aims to prevent," *Anderson v. Hale*, 202 F.R.D. 548, 554 (N.D. Ill. 2001) (quoting *Moody*, 654 F.2d at 800)).

In deciding whether attorney misconduct eliminates work-product protection, courts consider "the totality of the circumstances to determine whether the policies favoring disclosure

of such materials outweigh the client's legitimate interest in secrecy in a particular case." *Drummond Co.*, 885 F.3d at 1339; *see also Moody*, 654 F.2d at 800 ("A court must look to all the circumstances of the case . . . to decide whether the policy favoring disclosure outweighs the client's legitimate interest in secrecy" and prevent disclosure when it "would traumatize the adversary process more than the underlying legal misbehavior."). Factors a court considers include "the availability of alternate disciplinary procedures," whether disclosure "would traumatize the adversary process more than the underlying behavior," and the relationship between the misconduct and the information being sought. *Moreno v. Autozone, Inc.*, No. 05-CV-4432, 2008 WL 906510, at *3 (N.D. Cal. Apr. 1, 2008) (quoting *Moody*, 654 F.2d at 800–01).

Courts have applied the attorney-misconduct exception to various types of surreptitious or unethical behavior, such as secretly taping witness conversations. *See Anderson*, 202 F.R.D. at 558 ("In sum, because we agree that Defendants' counsel engaged in unethical conduct by surreptitiously taping conversations with witnesses, any work-product protection that otherwise may have existed is vitiated and Defendants' tapes must be disclosed to Plaintiff."); *Otto v. Box U.S.A. Grp., Inc.*, 177 F.R.D. 698, 701 (N.D. Ga. 1997) ("Because an attorney who violates ethics rules would be consciously exploiting the privilege for ends antithetical to that process . . . the privilege is vitiated."). Courts have applied the exception when attorneys submitted falsified documents. *See Chevron Corp. v. Salazar*, 275 F.R.D. 437, 454 (S.D.N.Y. 2011) (no work-product protection applied when an attorney both wrote and signed an expert report); *In re Doe*, 662 F.2d at 1080 (no work-product protection applied when an attorney "was a knowing participant in a plan to have witnesses testify falsely on his client's behalf, [and] to have documents altered or destroyed," among other things).

6

Courts have also applied the attorney-misconduct exception when attorneys have obstructed, or helped clients obstruct, the search for the truth. *See In re Sealed Case*, 676 F.2d at 815 (no work-product protection attached when an in-house lawyer for a corporation under investigation may have advised the chairman and president how to conduct a cover up); *United States v. Townsley*, 843 F.2d 1070, 1086 (8th Cir.), *on reh'g*, 856 F.2d 1189 (8th Cir. 1988) ("It is abundantly clear from our review of the conversations played for the jury that [the attorney] was vigorously participating in the obstruction of the grand jury's investigation.").

Notably, courts have also applied the attorney-misconduct exception when attorneys have made false statements to the court. *See United States v. $1.5 Million Letter of Credit as a Substitute Res for Seized Bank Accounts*, No. 90-CV-4450, 1992 WL 204357, at *5 (S.D.N.Y. Aug. 7, 1992) ("[C]ourts outside this jurisdiction have regularly applied the crime-fraud exception where only the attorney is accused of making statements for an unlawful purpose." ). For example, in *Occulto v. Adamar of N.J., Inc.*, the court eliminated work-product protection over documents after an attorney "made a false exculpatory statement concerning his conduct upon the record of a trial testimony deposition." 125 F.R.D. 611, 617 (D.N.J. 1989). The attorney stated that he had "never seen [a] document before" as the opposing counsel cross-examined his expert witness. *Id.* The attorney then conducted a "misleading re-direct examination" of the witness. Evidence in the case, however, demonstrated that the attorney had provided that document to his expert witness. *Id.* Though the document would normally enjoy work-product protection, the court held that the attorney's misconduct vitiated it. *Id.*

Here, the record shows that Black has made at least one misrepresentation to the court that is material and justifies overcoming work-product protection to a limited extent. On April 11, 2018, Villareal filed a summary judgment motion, signed by Black, stating that "[t]here is simply

7

no evidence to support" any notion that Rosendi is alive.  (Docket Entry No. 22 at 18).  A later summary judgment motion, also signed by Black, stated that the insurers would "never have evidence" that Rosendi is alive.  (Docket Entry No. 75 at 19).  The record contains prima facie evidence that Black made these statements either knowing that they were false or with reckless disregard for their truth.

Black had a conversation with Abraham on March 6, 2018, the day after Abraham first located Hernandez.  Black admits that he had a conversation with Abraham on March 6.  Telephone records from Abraham and Black both show that a conversation between them took place.  This conversation occurred while Abraham was making daily visits to Hernandez and seemed to be closer to detecting information about Rosendi.  While the parties dispute whether Black spoke with Abraham on March 5, the records show a March 6 conversation.  Villareal moved for summary judgment, with Black's signature, in April.[3]

Black argues that he did not know Hernandez's name when he filed the motion and that he did not receive "Abraham's reports containing [Hernandez's] name until last month because they were sitting in the investigative company's spam filter and were not forwarded to counsel."

---

[3] Black vigorously argues that he did not speak to Abraham on March 5, 2018, the date Abraham located Hernandez. During Abraham's deposition, Abraham testified that Black called him on March 5, 2018. Abraham testified that Black was angry at him.  Black called Abraham a liar and claimed that he did not speak to Abraham on March 5.  And in Villarreal's response to the court's November 16, 2020 order, Black claimed that he did not speak to Abraham until March 6.  Phone records produced to the court are inconclusive.

The produced phone records have handwritten notes that identify Pipkins's phone number.  These phone records show that Pipkins spoke with Abraham on March 5 at 12:44 p.m., within an hour of Abraham's first encounter with Hernandez.  Four minutes later, at 12:48 p.m., Abraham spoke with someone with a Houston phone number.  Abraham spoke with someone using the same phone number again at 1:24 p.m. It is unclear who was on the other end of the phone during the 12:48 p.m. and 1:24 p.m. conversations.  One handwritten note on the phone records suggests that the conversations were with Black.  Another handwritten note says that the phone number belongs to Walter Cubberly, also counsel for Villarreal, suggesting Cubberly was on the other end of the line.  These discrepancies are immaterial because both dates came before Black signed a summary judgment motion that affirmatively represented that there was "no evidence" that Rosendi was alive.

(November 24, 2020 Letter Brief for Villarreal, at 3).  This argument misses the point. Hernandez's name was not important; the fact that a woman had made statements that Rosendi was alive long after his reported death was important.  And even if the investigative company Villarreal hired had a spam filter that blocked its own investigator's reports, Black spoke with Abraham on March 6, and perhaps also on March 5.  Phone records also reveal that Abraham spoke with Pipkins at least 13 times between March 5 and March 8, including on March 5, shortly after Abraham and Hernandez first spoke.  Pipkins regularly reported to Black.  Text messages previously produced to the court for *in camera* review also show that Black was aware that Abraham had spoken to a woman who had seen Rosendi alive.  This is prima facie evidence that Black knew, before he signed Villarreal's summary judgment motion, about Hernandez and her statements to Abraham supporting the fact that Rosendi was alive.

In his deposition, Abraham testified that he was threatened after he reported his encounter with Hernandez to Pipkins.  Abraham did not testify who threatened him because Black objected that the identity of the speaker was protected.  Black revealed that he had knowledge of a threat to Abraham and suggested that he knew the identity of the speaker.  How Black knew of the threat or the speaker's identity is unclear.  It is also unclear why that information would be protected, unless one of Villarreal's representatives was the speaker, and a privilege or protection applied and no exception was present.

The misconduct surrounding Abraham's discovery of Hernandez justifies eliminating work-product protection over Abraham's investigation.  This opinion is bolstered by the totality of the circumstances. The insurers do not seek the mental impressions of Villarreal's counsel. They are seeking essentially the disclosure of facts, which will not harm the adversary process.[4]

---

[4] *See In re Antitrust Grand Jury*, 805 F.2d 155, 163 (6th Cir. 1986) (fact work product is "written or oral information transmitted to the attorney and recorded as conveyed by the client" while opinion work product

*See Moreno*, 2008 WL 906510, at *4 (permitting discovery of "responses to questionnaires, witness statements, and correspondence from witnesses" because "only fact work product [was] at issue and not opinion work product" and disclosure would not "traumatize the adversary process"); *see also Adams v. Mem'l Hermann*, No. 19-20651, 2020 WL 5103861, at *3 (5th Cir. Aug. 31, 2020) ("[T]he work-product doctrine 'protects only the [attorney's work product] and not the underlying facts.").

This case does not involve complicated legal questions.  It centers on whether Rosendi was alive when he was reported as dead and his widow, Villarreal, claimed the life insurance proceeds. Communications on the facts related to this question are not the core attorney work product the Federal Rules seek to protect.

Eliminating work-product protection over limited aspects of Abraham's investigation bears a "substantial relationship" to Black's misstatement.  Abraham's investigation is the best evidence the parties have so far disclosed to the court on whether Rosendi is alive.  The court has already held that the insurers were entitled to portions of Abraham's investigation file because of the undue burden and infeasibility of other ways to locate Hernandez.  (Docket Entry No. 146); *see also* Fed. R. Civ. P. 26(b)(3)(A) (allowing discovery of factual work product when a party shows "substantial need for the materials to prepare its case" and that it "cannot, without undue hardship, obtain their substantial equivalent by other means").  Black represented, after talking to Pipkins and Abraham following Abraham's first meeting with Hernandez, that there was no evidence that Rosendi was alive.  He then made efforts to have the court cut discovery off.  Both acts appear directed to concealing potentially key information.  Allowing the insurers to depose Abraham about his investigation is the best path to a level playing field at this stage.

---

is "any material reflecting the attorney's mental impressions, opinions, conclusions, judgments or legal theories").

When the insurers resume deposing Abraham, they may inquire into his investigation from the date that he began investigating the offices of Interactive Four, located in Suites 700–702 at Avenue Homero 527 in Mexico City, Mexico.  The insurers may inquire about the instructions Abraham received from counsel or Pipkins about investigating Avenue Homero 527, as well as subsequent communications with Black, Cubberly, Pipkins, or other representatives for Villarreal about his investigation into the Avenue Homero 527 offices and his conversations with and about Hernandez.  The primary disputes in this case center on Hernandez, how Abraham came to locate Hernandez and Avenue Homero 527, what Hernandez told Abraham, and what happened after Abraham located Hernandez.  Work-product-protected information that was learned only *before* Abraham was instructed to investigate Avenue Homero 527, or decided to include it in the investigation he had already been instructed to conduct, is not related to Black's misrepresentations and remains protected.

Because the court will allow the insurers to depose Abraham on his investigation on and after the date he was instructed or decided to investigate Hernandez and Avenue Homero 527, the court also orders Villarreal to produce new versions of Abraham's documents, which are Bates stamped as OSCAR GONZALEZ ABRAHAM DOCS 000001–000683.  Villarreal may keep her redactions on the Abraham documents that relate to events before Abraham was instructed or decided to investigate Avenue Homero 527 and Hernandez, but Villarreal must produce unredacted copies of the Abraham documents that relate to events after this date.

IT IS SO ORDERED.

SIGNED on December 10, 2020, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

11